# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:05-CR-0487** |
| | : | |
| v. | : | **(Judge Conner)** |
| | : | |
| **MARIANO ESCOBAR** | : | |

## MEMORANDUM

Presently before the court is a motion filed by defendant, Mariano Escobar ("Escobar"), to suppress evidence obtained during a consensual search of a vehicle he had rented. Escobar argues that he did not voluntarily consent to the search and that the consent of the driver of the vehicle, co-defendant Alan M. Nunez ("Nunez"), was not valid against him. For the reasons that follow, the court will deny the motion to suppress.

**I.   Findings of Fact**[1]

On December 11, 2005, Pennsylvania State Police Trooper Jeffrey S. Kolodzi ("Trooper Kolodzi"), stopped Nunez for driving a U-Haul vehicle[2] at speeds in excess of the posted limits along Interstate 81. (Doc. 42 at 4-5.) Trooper Kolodzi parked his vehicle behind the U-Haul on the right shoulder of the road and

---

[1] These findings are based on testimonial and documentary evidence presented at the hearing on the motion, as well as the police video provided by the parties. See United States v. Pelullo, 173 F.3d 131, 135-38 (3d Cir. 1999); see also Ornelas v. United States, 517 U.S. 690, 695-98 (1996). They substantially reflect the testimony given by the troopers, which the court credits for the reasons provided herein.

[2] The U-Haul vehicle was an approximately 14-foot "box van" with a bench seat in the front and the "box" (i.e., cargo area) in the back. There was no access to the rear, cargo area of the vehicle from the front seat area. (Doc. 42 at 9-10.)

approached the passenger side window to request Nunez's license and registration. Nunez and Escobar produced their driver's licenses, the vehicle rental agreement, and an insurance card. (Doc. 42 at 6-8.) Escobar was named on the rental agreement as the renter of the U-Haul; Nunez was not listed as an authorized driver. (Doc. 42 at 9, 33.)

Trooper Kolodzi requested that Nunez step out of the U-Haul and go to the back, passenger side of the vehicle, where he proceeded to ask Nunez a few standard questions. (Doc. 42 at 14.) Nunez's responses were vague and inconsistent. Nunez initially informed Trooper Kolodzi that his belongings were in the cargo area of the U-Haul because he was moving and that the defendant had flown from Massachusetts to North Carolina to help him move. However, Nunez could not immediately provide the name of his passenger and later gave an incorrect name. Nunez ultimately explained that he had known the passenger for approximately three years and that he had met the defendant through his sister. At one point, Nunez said he was moving to New York. He later indicated that he was moving in with his sister in New Jersey, but he was unable to provide an address. He hesitated when asked his sister's name and subsequently indicated it was Freda; nevertheless, he was unable to provide her last name to Trooper Kolodzi. In addition, Nunez was unable to provide the name, address, city, or phone number of his employment. Trooper Kolodzi asked Nunez why the U-Haul was rented in Georgia. Nunez responded that he had moved to Georgia despite his previous statements that his residence was in North Carolina and that he did not leave North

Carolina for any extended period while living there. (Doc. 42 at 14-17, 52-54, 61-63.) These numerous inconsistencies aroused Trooper Kolodzi's suspicions, prompting him to request backup from Trooper Tony Todaro ("Trooper Todaro"), an officer in one of drug units. (Doc. 42, Gov't Ex. 5 at 13.)

Because Escobar indicated that he did not speak English, Trooper Kolodzi requested a Spanish interpreter. (Doc. 42 at 8, 14.) Trooper Bryan R. Henneman ("Trooper Henneman"), named on a State Police Spanish interpreter list,[3] responded to the request. (Doc. 42 at 73; Doc. 42, Gov't Ex. 4.) Using Trooper Henneman as interpreter, Trooper Todaro questioned Escobar about the nature of the trip and the contents of the U-Haul. (Doc. 42 at 74-75.) According to Trooper Henneman, Escobar responded that he had known Nunez for approximately fifteen years and that they had met in Puerto Rico. Escobar informed the troopers that some clothing and a bed in the cargo area belonged to him. (Doc. 42 at 75.)

After Troopers Henneman and Todaro questioned Escobar, Trooper Kolodzi returned all of the documentation and issued a warning for speeding to Nunez. (Doc. 42 at 17-19; Doc. 42, Gov't Ex. 1.) Trooper Kolodzi informed Nunez, who was seated in the driver's seat of the U-Haul, that he was "free to leave."[4] (Doc. 42

[3] Along with on-the-road training while a trooper, Trooper Henneman had four and a half years of Spanish education in middle and high school and took a few Spanish courses while in college. (Doc. 42 at 69-70.) There are no fluency or competency tests or specific educational requirements for the interpreter list. (Doc. 42 at 81-82.)

[4] It is unclear when, but at some point, Nunez informed Escobar that they were free to leave. (Doc. 42 at 119, 123.)

at 18.)  Trooper Kolodzi started to walk away from the passenger side, but a few seconds later reapproached and asked Nunez if he could ask him a few more questions.  Nunez responded "yes" and, without prompting, exited the U-Haul and walked to the back of the vehicle.  (Doc. 42 at 18-20, 60.)

Trooper Kolodzi asked Nunez some questions to clarify a few of his earlier, inconsistent responses.  The trooper also asked Nunez if there was anything illegal in the U-Haul, to which Nunez replied "no."  (Doc. 42 at 20-21.)  Finally, Trooper Kolodzi asked Nunez if he would give consent to search the entire truck, and informed Nunez that he could refuse the request.  Nunez agreed to the search (Doc. 42 at 22) and also signed a consent form written in Spanish,[5] which was titled "Waiver of Rights and Consent to Search" (Doc. 42, Gov't Ex. 2).  The form, as translated in English, provides, in part:

> I, _____
> HAVE BEEN REQUESTED BY _____
> OF THE PENNSYLVANIA STATE POLICE TO GIVE MY CONSENT
> FOR POLICE OFFICERS TO SEARCH PLACE(S), ITEM(S), OR
> VEHICLE(S) DESCRIBED ABOVE FOR THE ITEMS DESCRIBED
> ABOVE.  I HAVE BEEN TOLD THAT I DO NOT HAVE TO GIVE MY
> CONSENT.  I UNDERSTAND THAT I HAVE THE RIGHT TO
> REFUSE THIS REQUEST, AND THAT THE POLICE MAY NOT BE
> ABLE TO CONDUCT THIS SEARCH WITHOUT A SEARCH
> WARRANT UNLESS I GIVE MY CONSENT.  NONETHELESS, I
> VOLUNTARILY GIVE MY CONSENT TO THE POLICE TO
> CONDUCT THIS SEARCH.
>
> * * *

---

[5] There is no dispute that Nunez could read and communicate in Spanish.

> No one, including anyone from the Pennsylvania State Police or any other police officer, has threatened me in any way, nor has anything been promised to me in return for giving my consent to conduct this search.

(Doc. 42, Gov't Exs. 2-3.)  Nunez printed and signed his name as the consenter and provided his North Carolina address on the consent form.  The following information was also filled in on the form:  (1) the vehicle to be searched; (2) the items to be searched for and seized, if found; (3) Nunez's indication that he owned the places, items, or vehicles to be searched; and (4) Trooper Henneman's name and signature as a witness.  (Doc. 42 at 100-01; Doc. 42, Gov't Exs. 2-3.)

     Following Nunez's consent to the search, Trooper Henneman approached Escobar.  When asked if there was a problem with the troopers looking in the truck, Escobar replied "no."  Trooper Henneman then had Escobar examine and read the same consent form that Nunez had signed.[6]  (Doc. 42 at 78-79.)  The above-mentioned information was already filled in on the form before Trooper Henneman presented it to Escobar.  (Doc. 42 at 128.)  After providing Escobar with sufficient time to examine the consent form, Trooper Henneman asked Escobar if he understood the form.  Escobar replied "yes."  Trooper Henneman then asked Escobar to sign the consent form.  (Doc. 42 at 78-79, 110.)  Escobar printed and signed his name on an empty "witness" line on the form.  (Doc. 42 at 79; Doc. 42, Gov't Exs. 2-3.)

---

[6] Trooper Henneman testified that Escobar appeared to read the consent form.  (Doc. 42 at 79-80.)

After the troopers obtained the oral and written consent, Nunez opened the unlocked, back door of the U-Haul to the cargo area. (Doc. 42 at 48, 128.) The troopers had radioed for a "drug dog." The dog, after being placed in the cargo area, signaled to the troopers its detection of the scent of narcotics. (Doc. 42 at 66; Doc. 42, Gov't Ex. 5 at 47.) Trooper Todaro searched the area where the dog alerted and discovered a duffle bag containing thirty-three kilograms, or "bricks," of what was believed, and later confirmed, to be cocaine.[7] (Doc. 42, Gov't Ex. 5 at 18-20, 48-49; Doc. 42 at 23; Doc. 42, Gov't Ex. 6.) The troopers immediately took Nunez and Escobar into custody.[8] (Doc. 42 at 24.)

Escobar was later charged by federal indictment with: (1) conspiracy to manufacture, distribute, and possess with intent to distribute cocaine hydrochloride, (2) the manufacture, distribution, and possession with intent to distribute cocaine hydrochloride, and (3) possession of a firearm in furtherance of drug trafficking.[9]

The instant motion to suppress was filed in February 2006. In it, Escobar argues that the troopers' continued questioning after returning their documentation constituted an unlawful seizure, that he did not voluntarily consent

---

[7] At no time during the troopers' search of the cargo area did Escobar object to the search. (Doc. 42 at 27, 63-64, 66, 80.)

[8] After towing the U-Haul back to the state police barracks and obtaining a search warrant, the police found ten more "bricks" of cocaine and three semiautomatic weapons. (Doc. 42 at 24.)

[9] See 18 U.S.C. § 924(c)(1)(A)(i); 21 U.S.C. §§ 841(a)(1), 846.

6

to the search, and that Nunez's consent was not valid against him. A hearing was held on March 15, 2006, during which Troopers Kolodzi and Henneman testified and offered a substantially consistent, candid, and credible version of the events at issue. Escobar also took the witness stand, but presented a significantly less clear—and less credible—account of the events. No other witnesses were presented. The parties subsequently briefed the issues and the matter is now ripe for disposition.

**II.   Discussion**

With limited exceptions, the Fourth Amendment's prohibition against "unreasonable searches and seizures" requires officials to obtain a warrant before searching persons or property. See United States v. Arvizu, 534 U.S. 266, 573 (2002). A warrantless search is presumptively unreasonable, and the burden is on the government to establish, by a preponderance of the evidence, that the circumstances justified acting without a warrant. See Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Matlock, 415 U.S. 164, 177 (1974); Vale v. Louisiana, 399 U.S. 30, 34 (1970).

Although strictly a legal issue, the constitutional reasonableness of a search is fact-specific, dependent on the individual circumstances surrounding the officers' conduct. See Ornelas v. United States, 517 U.S. 690, 695-98 (1996) (citing Ker v. California, 374 U.S. 23, 33 (1963)). It is not usually susceptible to answer-by-analogy but must be evaluated through application of the particular facts of the case to general guiding principles. See Illinois v. Gates, 462 U.S. 213, 231-32 (1983); see also

Christopher v. Nestlerode, 373 F. Supp. 2d 503, 514-15 (M.D. Pa. 2005); United States v. Wogan, 356 F. Supp. 2d 462, 466 (M.D. Pa. 2005).  Every search is, in essence, *sui generis*.

One recognized exception to the warrant requirement permits police officers to conduct a search if they obtain consent from the individual in control of the area to be searched.  See United States v. Drayton, 536 U.S. 194, 200-01 (2002).  Consent, to be effective, must be given voluntarily and during the course of a legal encounter. Id.  The legality of an encounter often turns on whether the individual has been "seized" by police, implicating Fourth Amendment protections.  Id.  If no seizure has occurred, the sole question becomes whether the consent was voluntary.  Id.; United States v. Griggs, 114 F. Supp. 2d 334, 338 (M.D. Pa. 2000).

Whether a police encounter rises to the level of a seizure, requiring police to have at least "reasonable suspicion" of illegal activity, hinges on whether a reasonable person, exposed to the same surrounding circumstances, would feel free to terminate the encounter.  Drayton, 536 U.S. at 202.  "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation through coercive means."  Id.  Coercion, sufficient to transform an encounter into a seizure, generally requires that police act in a threatening or dominating manner, by brandishing a firearm or making a "show of force."  Id.  That an officer wears a uniform and a holstered sidearm does not,

without more, create intimidation sufficient to overcome the resolve of a "reasonable person." Id.

In the matter *sub judice*, it is undisputed that the initial traffic stop constituted a seizure. See United States v. Wilson, 413 F.3d 382, 386 n.3 (3d Cir. 2005). Escobar concedes that this seizure was lawful under the Fourth Amendment for a violation of state traffic laws. (See Doc. 30 at 3; see also Doc. 49 at 5.) He contends, however, that the troopers' further questioning after returning all documentation constituted a second seizure. A traffic stop may become a consensual encounter, not considered a seizure under the Fourth Amendment, after the return of documentation. See Wilson, 413 F.3d at 386-87. The relevant inquiry again is whether, under the totality of the circumstances, a reasonable person would feel free to terminate the encounter. See id. at 387.

The record in this case is devoid of evidence of coercion or intimidation sufficient to transform the "second" encounter into a seizure. After Nunez received his citation and the traffic stop was ostensibly concluded, Trooper Kolodzi informed Nunez that he was "free to leave," and did nothing thereafter to detain Nunez or prevent him from leaving. Indeed, after Trooper Kolodzi asked him if he would answer a few more questions, Nunez voluntarily exited and went to the back of the U-Haul where troopers merely posed additional, clarifying questions. Whatever coercive effect this questioning produced on Nunez may be attributed to consciousness of guilt rather than extraneous pressure. See Drayton, 536 U.S. at 202. ("The reasonable person test . . . presupposes an *innocent* person."). A

reasonable, innocent person would not have felt intimidated or pressured by the troopers' questions, predicated as they were by the advice that Nunez was "free to leave." The interaction between the troopers and Nunez did not rise to the level of a "seizure,"[10] but constituted a mere encounter in which Nunez could effectively consent to a search of the vehicle.

Nor was the "second" encounter with Escobar a seizure.[11] As with Nunez, there is no evidence of intimidation or coercion by the troopers. Following the return of all documentation and Nunez's consent, the troopers did not pose any clarifying questions to Escobar. Trooper Henneman merely asked Escobar if he

---

[10] Even assuming, *arguendo*, that the encounter was a seizure, the troopers had a "reasonable, articulable suspicion of criminal activity" to warrant detaining Nunez and Escobar for further investigation. See United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003) ("After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.") Nunez was unable to answer basic questions regarding their travel plans and could not give the name of his passenger, who had flown from Massachusetts to North Carolina to help him move. Nunez's responses also contained many inconsistencies. Based on his training and experience, Trooper Kolodzi became suspicious of illegal activity because of Nunez's inability to answer these questions and the inconsistencies in his responses, along with some of Escobar's responses. (See Doc. 42 at 16-17, 53-54.); Givan, 320 F.3d at 459 (finding that after receiving conflicting stories from the driver and passengers, the officer "was justified in further extending the stop and asking for consent to search the vehicle").

[11] But see supra note 10.

had a problem with the troopers looking in the U-Haul.[12] The presence of multiple troopers on the scene does not automatically transform this encounter into a seizure. See id. at 198, 204 (finding that no seizure had occurred when three officers boarded a commuter bus to search for illegal narcotics). Nor does the location of the traffic stop on the side of the highway. See Wilson, 413 F.3d at 387. There is no evidence that any of the troopers acted in a dominating or threatening manner. In fact, Trooper Henneman's presence was requested to facilitate communication with Escobar. A reasonable, innocent person, after having his documentation returned, would not have felt intimidated or pressured under these circumstances. Accordingly, Escobar could effectively consent to the search of the U-Haul.

Nothing in the record suggests that Escobar's consent was involuntary. Trooper Henneman did not use force or intimidation when asking Escobar if the troopers could look in the U-Haul. Escobar testified that he told Trooper Henneman that there was no problem with the troopers checking the truck. (Doc. 42 at 123.) Although Escobar was not told specifically that he could refuse consent to search, the very fact that Trooper Henneman *asked* if Escobar had a problem with the troopers looking in the truck implies a right to refuse. Moreover,

---

[12] Although Trooper Henneman did not personally inform Escobar he was free to leave, Nunez did so. See Drayton, 536 U.S. at 202 (finding, in circumstances in which police did not advise individuals that they could leave, that no seizure had occurred); see also Ohio v. Robinette, 519 U.S. 33, 35 (1996) (holding that the Fourth Amendment does not require that a lawfully seized person "be advised that he is 'free to go' before his consent to search will be recognized as voluntary").

11

immediately after his oral consent, Escobar examined the consent form written in Spanish.[13]  The form clearly indicated that the consenter had a right to refuse consent and that the police may not be able to conduct the search without a search warrant unless consent is given.  Further, regardless of Escobar's subjective awareness, lack of knowledge of the right to refuse consent cannot, without more, establish that consent was involuntary.  See Drayton, 536 U.S. at 207-08 (stating that knowledge of the right to refuse consent is merely one factor in the voluntariness analysis and is not the "*sine qua non* of an effective consent").  There is no indication that Escobar was unable by virtue of his age or intelligence to understand the situation.[14]  Coupled with the lack of intimidation or show of force

---

[13] Escobar contends that he believed the form was a warning for speeding, that he did not read the form before signing it, and that he did not know that Nunez had consented to a search of the U-Haul. (Doc. 42 at 121-22, 124).  This contention is not credible.  The form, written in Spanish, is clearly titled "Waiver of Rights and Consent to Search," and the police video shows Escobar examining the document before signing it.  (Doc. 42, Gov't Exs. 2-3, 6.)  Trooper Henneman testified that Escobar appeared to read the form.  Indeed, Escobar testified that the form was completely filled in before he signed it, including Nunez's name and signature as the consenter.  When asked if he understood the form, Escobar replied "yes." (Doc. 42 at 78-79, 128.)  Accordingly, the court finds Escobar's suggestion of uninformed consent to be meritless.

[14] Escobar also raises a challenge to his consent based upon Trooper Henneman's inability to translate properly from English to Spanish.  However, at the hearing on defendant's suppression motion, Escobar admitted that he told Trooper Henneman that he had no problem with the troopers checking the truck. (Doc. 42 at 123.)  This admission strongly suggests that Trooper Henneman's interpretation skills were effective and the court so finds.

by any of the troopers, these circumstances demonstrate that Escobar's consent was voluntary.[15]

Assuming *arguendo* that Escobar's consent was invalid, the court nonetheless finds that Nunez's voluntary consent[16] during a legal police encounter was valid against Escobar. A third party with the requisite "joint access and control" of the area to be searched has the authority to consent, even where another person has an

---

[15] Without citing any legal authority, Escobar argues that permitting the troopers to "look in the truck" cannot be deemed consent to search because it does not specify the area or items to be searched. This argument is unpersuasive. An objective reasonableness standard governs the scope of consent. See United States v. Kim, 27 F.3d 947, 956 (3d Cir. 1994) ("The standard . . . is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991))). The consent form that Escobar read and signed, see supra note 13, clearly indicated that the troopers were planning to conduct a full search of the U-Haul for all illegal contraband. Moreover, Escobar was aware that Nunez opened the rear door to the cargo area after their consent to search. At no time did Escobar object to the search of the cargo area or try to limit it, thus affirming that this search was within the scope of his consent. See United States v. Morales, 861 F.2d 396, 400 (3d Cir. 1988). Under these circumstances, a reasonable person would understand that Escobar consented to a full search of the U-Haul.

[16] Escobar does not argue that Nunez's consent was involuntary and the evidence of record clearly demonstrates that Nunez's consent was voluntary. It is undisputed that Trooper Kolodzi advised Nunez that he was "free to leave," and his subsequent actions neither blocked nor hindered Nunez's egress. Nunez gave his consent in broad daylight on the side of a major highway. See Givan, 320 F.3d at 459. No force or threat of force was used to secure Nunez's consent. Not only did Trooper Kolodzi inform Nunez of his right to refuse a search, but the consent formed signed by Nunez also acknowledged the right to refuse the search. The lack of any intimidation or show of force by the troopers, the absence of any indication that Nunez was unable by virtue of age or intelligence to understand the situation, and the knowledge that he could refuse to consent demonstrate that Nunez's consent was voluntary. See Drayton, 536 U.S. at 207-08; Griggs, 114 F. Supp. 2d at 348.

interest in the area.  See United States v. Morales, 861 F.2d 396, 399 (3d Cir. 1988); see also Matlock, 415 U.S. at 170-71.

> The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-[users] has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 171 n.7.

As the driver of the U-Haul, Nunez had the requisite "joint access and control" of the U-Haul to give him the authority to consent to the search.  See Morales, 861 F.2d at 399 ("Because a driver has control over the entire vehicle, that driver may consent to a full search of the vehicle, including its trunk, glove box and other components."); id. ("By giving [the driver] control over the car, [the lessee] conferred on [the driver] power to consent to a reasonable search of it.").  Nunez was not just a mere driver of the U-Haul.  According to both Nunez and Escobar, they were using the U-Haul to move Nunez to New Jersey.  Nunez indicated that the contents of the cargo area were his, and Escobar did not claim sole possession of these items or a special privacy interest in them.  See id. at 400.  Nunez had general access to all areas of the U-Haul, including the unlocked cargo area.  Indeed, Nunez opened the rear door to the cargo area after both he and Escobar consented to the search.

Escobar had unequivocal knowledge that Nunez had consented to a full search of the U-Haul.[17]  Escobar examined and signed the consent form, which was written in Spanish.  The form clearly indicated that Nunez had consented, with the knowledge that he could refuse to consent, to a full search of the U-Haul for illegal contraband.  After learning of Nunez's consent, Escobar affirmed Nunez's authority to consent to the search, and impliedly consented himself, when he did not object to the search at any time while the troopers conducted the search.[18]  See id.

Accordingly, the court finds that Escobar's consent, given during a legal police encounter, was voluntary.  The court also finds that Nunez's consent, voluntarily given during a legal police encounter, was valid against Escobar.  The court will therefore deny the motion to suppress.

An appropriate order will issue.

   /s/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:     April 27, 2006

---

[17] See supra note 13.

[18] Escobar argues that Nunez could not consent to the search because the troopers knew that Escobar was the lessee and was available to consent.  This argument is unpersuasive.  Third-party consent is based on the reduced expectation of privacy inherent in shared control.  See Matlock, 415 U.S. at 171 n.7.  Hence, an owner/lessee's presence does not alter the determination of whether a third party has the requisite authority to consent.  See, e.g., United States v. Eldridge, 984 F.2d 943, 948 (8th Cir. 1993).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:05-CR-0487** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **MARIANO ESCOBAR** | : | |

### **ORDER**

AND NOW, this 27th day of April, 2006, upon consideration of defendant's motions to suppress evidence (Doc. 29), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 29) is DENIED.

  /s/ Christopher C. Conner  
CHRISTOPHER C. CONNER
United States District Judge